[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13102
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cr-00346-TCB-CMS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICARDO SILVA,
a.k.a. Pops,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 27, 2020)

Before WILSON, JILL PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Ricardo Silva appeals his convictions and 420-month total sentence for drug-trafficking offenses and possession of a firearm during a drug-trafficking crime. On appeal, Silva argues that (1) the district court erroneously denied his motion for a judgment of acquittal; (2) the district court erroneously applied an importation sentencing enhancement, pursuant to U.S.S.G. § 2D1.1(b)(5); and (3) his 420-month total sentence was procedurally and substantively unreasonable. After careful consideration, we affirm.

## I.     BACKGROUND

### A. Factual Background[1]

As part of an investigation of a methamphetamine trafficking ring, agents with the Drug Enforcement Administration ("DEA") wiretapped a cell phone that Silva was using while he was an inmate at Smith State Prison under the custody of the Georgia Department of Corrections. DEA agents intercepted numerous texts and phone calls in which Silva coordinated deals to sell large quantities of methamphetamine. Acting undercover, Agent Chase Hallman contacted the wiretapped phone to set up a drug deal. Hallman sent a text message saying that he was "[l]ooking for some work." Doc. 242 at 28.[2] Silva responded, "[T]hat's cool.

---

[1] The facts come from the evidence adduced at trial and the unobjected-to facts contained in the presentence investigation report.

[2] "Doc. #" refers to the numbered entry on the district court's docket.

2

I'll be ready but I come out after 6 P.M." *Id.* at 29.  Hallman texted the cell phone again later that evening.  He wrote, "So you are good with twelve five for a whole [kilogram]?" *Id*. at 30.  Silva responded "Yes.  If you get consistent I will drop the number some." *Id*.

Hallman and Silva then talked on the phone to arrange the deal.  Silva told Hallman to meet with someone named Flacko to complete the transaction.  On the day of the arranged deal, an undercover agent met with Flacko.  When Flacko gave the agent only half a kilogram of methamphetamine—not the whole kilogram agreed upon—Hallman contacted Silva about the discrepancy.  Silva promised that he would give Hallman extra methamphetamine to compensate for the mix-up.  When Hallman contacted Flacko about getting the extra methamphetamine, Flacko said that he had not gotten permission from Silva to "turn over the dope." *Id*. at 44.  Silva told Hallman to contact another one of his associates, Lydia Beck, about making up the shortage.  When Hallman called Beck, she said that she "usually winds up fixing" Silva's mistakes. *Id*. at 56.  He met Beck, and she gave him the methamphetamine.

After the transaction, law enforcement continued to investigate Silva.  During the investigation, the wiretap picked up a phone call between Silva and Beck, in which Silva asked Beck to hold drugs for another associate, Scrappy.  From the wiretap, investigators learned the address of the house where the drugs

would be delivered, set up surveillance at the house, and obtained a search warrant. When the officers executed the search warrant the next day, they found 13-gallon jugs containing methamphetamine in solution.

From the wiretap, investigators picked up another phone call in which Silva organized a drug deal with an associate, Leslie Nelson. Law enforcement set up surveillance, watched the deal take place, and intercepted texts between Silva and Nelson confirming that the deal was done. Nelson drove away and, shortly thereafter, was apprehended by a Georgia patrolman. A search of her truck revealed three kilograms of methamphetamine and a loaded gun. The gun was not registered under Silva's name. The wiretap picked up no conversations between Silva and Nelson in which they discussed the gun.

## B. Procedural Background

Silva was charged with (1) conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count 1); (2) four counts of possession with intent to distribute, in violation of § 841(a)(1) (Counts 2–5); and (3) possession of a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 6). He pled not guilty.

### 1. The Criminal Trial

At trial, the government presented evidence to the jury about its investigation, including testimony about how the cell phone was used to organize

4

the drug transactions discussed above. The government also presented evidence linking the cell phone to Silva. DEA Officer Robert Keim testified that he searched Silva's prison cell and discovered the cell phone that was the subject of the wiretap. By listening to the intercepted phone calls and talking to Silva in person, Keim determined that Silva was the prisoner who possessed the cell phone and used it to coordinate drug deals. Keim was "confident" that Silva was the primary user of the cell phone because he had spoken with Silva once "for approximately five minutes," and Silva had "an extremely distinct voice." Doc. 241 at 113–14.

On cross-examination, when asked whether he thought the voice in the calls was Silva's, Keim testified, "I am pretty confident—I am confident that that was his voice that we captured." *Id.* at 123. He later confirmed, "It's Silva." *Id*. at 124. He did not consult with an expert or request a voice exemplar to confirm that the voice on the phone was Silva's. There was no security video footage showing Silva using the phone or cell site data showing that the phone was located in the prison on the days the drug deals took place. Other than Silva's roommate, Keim interviewed no other prisoners to see whether they had access to the phone.

Jonathan Santiago, an officer at Smith State Prison, testified that he interacted with Silva once or twice a week and was familiar with Silva's voice,

which was distinctive.  When the government played an audio recording from an intercepted phone call on Silva's cell phone, Santiago recognized Silva's voice.

Hallman testified that he was present for the search of Silva's prison cell. The identification number of the cell phone that was wiretapped matched that of the cell phone found in Silva's prison cell.  After the search, Hallman spoke with Silva and recognized Silva's voice from the phone calls.  Hallman testified that one of Silva's associates, Pollo, "was in Mexico" during the entire investigation.  Doc. 242 at 131.  Hallman also testified that, in his experience, it was common for guns to be associated with drug deals and drug stashes.

The government rested.  Silva then moved for a judgment of acquittal on all counts, pursuant to Federal Rule of Criminal Procedure 29(a), arguing that the evidence was insufficient to prove that he participated in the charged crimes.  The district court denied the motion, and Silva rested without presenting any evidence. The jury found Silva guilty on all counts.

### 2.  Sentencing

Before sentencing, the probation office prepared a presentence investigation report ("PSR").  According to the unobjected-to facts in the PSR, Silva coordinated with co-conspirators and trafficked large quantities of methamphetamine while he was incarcerated.  The PSR determined that Silva could be held accountable for

4,761.5772 grams of "methamphetamine actual" and 65.504 kilograms of methamphetamine mixture.

The PSR calculated that Silva's total offense level was 44, which included a two-level enhancement for importation of methamphetamine under the United States Sentencing Guidelines, U.S.S.G. § 2D1.1(b)(5).  The PSR explained that Silva "knew that the methamphetamine involved in the offense was imported by Pollo, [Silva's] source of supply in Mexico."  PSR ¶ 86a.  Regarding Silva's criminal history, the PSR noted that he was serving a sentence for a past drug conviction and had been incarcerated since 2010.  The PSR determined that Silva's criminal history category was III.  Based on an adjusted offense level of 44 and a criminal history category of III, the PSR determined that Silva's Guidelines range was life plus 60 months' imprisonment.

In a sentencing memorandum, Silva objected to the two-level importation enhancement under § 2D1.1(b)(5), arguing that there was no evidence showing that he participated in the importation of the methamphetamine from Mexico or knew it was imported from Mexico.  He stated that "almost all methamphetamine available in [the United States] is now imported from Mexico."  Doc. 169 at 1.  Additionally, Silva argued that the recommended Guidelines sentence was disproportionately harsh in his case, which involved no violence, large sums of money, or major distribution network.  The government responded that the importation

7

enhancement was appropriate because Silva's crimes "simply involved the importation" of methamphetamine, which was all the enhancement required.  Doc. 171 at 1-2.

At sentencing, the district court adopted the unobjected-to facts and legal conclusions in the PSR.  The court noted that it had read the parties' sentencing memoranda and heard argument from Silva regarding the importation enhancement.  Silva argued at sentencing that the importation enhancement was inapplicable because there was no evidence that he knew the methamphetamine came from Mexico.  Silva asserted that the government's reading of the enhancement was "way too expansive because virtually all of the meth[amphetamine] comes from Mexico now, [and] it would apply to everybody."  Doc. 244 at 3.   In response, the government submitted written summaries of phone calls between Silva and his associates that were prepared as part of the DEA investigation.  Silva did not object, and the court admitted the evidence, which showed that: (1) Silva told one associate that he got his product from Pollo, who was in Tamuaulipas, Mexico; (2) Silva asked another associate if he could call Mexico on his phone, and then told the associate to call Pollo; (3) Silva told yet another associate that he was talking to "the guy . . . in Mex"; and (4) Pollo sent Silva a text message telling him that Pollo was in a cartel.  Doc. 206-2 at 1–4.  The court overruled Silva's objection, stating that there was not "any way around"

applying the enhancement and noting that, as Silva had stated, "there is not much meth, at least significant amounts of it, in Georgia that is not imported from Mexico." Doc. 244 at 3–4.

The court asked the parties for their sentencing recommendations. The government argued that a total sentence of life plus 60 months was appropriate considering Silva's leadership role in the conspiracy and history of trafficking drugs. Silva requested a total sentence of 25 years (300 months), the statutory minimum, arguing that there were no "sufficient aggravators" to justify a total life sentence. *Id.* at 13-14. Stating that it had "carefully considered all of the sentencing factors set forth" in 18 U.S.C. § 3553(a), the court sentenced Silva to a below-guidelines total sentence of 420 months, which included 360 months as to Counts 1–5, to run concurrently, and 60 months as to Count 6, to run consecutively to the 360-month term for Counts 1–5. *Id.* at 18. Silva objected, without success.

This is Silva's appeal.

## II.    STANDARDS OF REVIEW

We review *de novo* the denial of a Rule 29 motion for a judgment of acquittal, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility determinations in the government's favor. *United States v. Cooper*, 926 F.3d 718, 734 (11th Cir. 2019). We review the district court's factual findings at sentencing for clear error, but we

review the district court's application of the Sentencing Guidelines *de novo*. *United States v. Matos-Rodriguez*, 188 F.3d 1300, 1309 (11th Cir. 1999).  We review the reasonableness of a sentence under a deferential abuse of discretion standard.  *Gall v. United States*, 552 U.S. 38, 41 (2007); *see also United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) ("A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." (internal quotation marks omitted)).

## III.   DISCUSSION

### A. Motion for a Judgment of Acquittal

Silva first argues that the district court erred in denying his motion for a judgment of acquittal.  We will uphold the denial of a Rule 29 motion if "a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt."  *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000).  Because "the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, our sufficiency review requires only that a guilty verdict be reasonable, not inevitable, based on the evidence."  *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007) (internal quotation marks omitted).

10

Silva argues that the district court erroneously denied his motion for a judgment of acquittal on Counts 1–5 because the evidence failed to establish that he was the person coordinating the drug deals on the cell phone. We disagree: that argument is belied by the record. At trial, witnesses testified that (1) officers found the wire tapped cell phone in Silva's prison cell, (2) Silva had a distinctive voice, and (3) the voice on the wiretapped cell phone matched Silva's voice. Further, undercover officers mentioned Silva to Silva's associates, and the associates appeared to acknowledge that Silva was involved in the drug deals. In light of that evidence, the jury reasonably concluded that Silva used the phone to coordinate drug deals and traffic methamphetamine. *See Rodriguez*, 218 F.3d at 1244.

Silva points out that the government failed to present any voice exemplar evidence to confirm that it was his voice on the cell phone. Even assuming that the lack of exemplar evidence meant that a guilty verdict was not "inevitable," that in and of itself does not render the jury's guilty verdict unreasonable. *See Browne*, 505 F.3d at 1253. In light of the substantial evidence, discussed above, indicating that Silva was the inmate using the wiretapped cell phone, a reasonable trier of fact could conclude that the evidence established Silva's guilt beyond a reasonable doubt. *See Rodriguez*, 218 F.3d at 1244. Thus, the district court did not err in denying Silva's motion for a judgment of acquittal on Counts 1–5.

Silva further argues that the evidence was insufficient to convict him under § 924(c) because it was not reasonably foreseeable that Nelson would carry a gun to her drug deal. Appellant's Br. at 22. To prove a violation of § 924(c), the government was required to show that, during and in relation to a drug-trafficking conspiracy, the defendant used, carried, or possessed a firearm in furtherance of that conspiracy. *United States v. Gunn*, 369 F.3d 1229, 1234 (11th Cir. 2004). A conspirator may be found guilty of violating § 924(c) even if he was not present when the offense was committed "if the carrying or using of a firearm by a coconspirator is a reasonably foreseeable action of the conspiracy." *United States v. Diaz*, 248 F.3d 1065, 1100 (11th Cir. 2001).

Based on the evidence at trial, a reasonable jury could conclude that it was reasonably foreseeable that Nelson would carry a gun to a drug deal, so Silva was not entitled to a judgment of acquittal on Count 6. *See id.*; *see also Rodriguez*, 218 F.3d at 1244. The jury heard evidence that Silva communicated with Nelson to set up the drug deal. Although the jury heard no evidence that Silva and Nelson discussed a gun, the jury did hear Hallman testify that drugs and guns were typically associated with one another. In addition, the jury heard that (1) Silva coordinated multiple drug deals for the sale of methamphetamine and worked with numerous associates, and (2) the drug deals involved large quantities of methamphetamine. Under our precedent, this evidence was sufficient for a jury to

12

have found that it was "reasonably foreseeable" that Silva's co-conspirator would carry a firearm. *See United States v. Hromada*, 49 F.3d 685, 689 (11th Cir. 1995) (explaining that in general "[g]uns and violence go hand-in-hand with illegal drug operations."). Accordingly, we affirm on this ground.

## B. Importation Guideline Enhancement

Silva also argues that the district court erred at sentencing when it applied an enhancement because the offense involved the importation of methamphetamine. "The burden of establishing evidence of the facts necessary to support a sentencing enhancement falls on the government, and it must do so by a preponderance of the evidence." *United States v. Perez-Oilveros*, 479 F.3d 779, 783 (11th Cir. 2007). The district court must ensure that the government carries this burden by finding a sufficient basis for the requested enhancement. *Id.*

The Sentencing Guidelines provide for a two-level enhancement to a defendant's offense level when "the offense involved the importation of amphetamine or methamphetamine or the manufacture of amphetamine or methamphetamine from listed chemicals that the defendant knew were imported unlawfully." U.S.S.G. § 2D1.1(b)(5). We previously addressed the scope of this enhancement in *Perez-Oliveros*. In *Perez-Oliveros*, the defendant was apprehended while driving a truck loaded with methamphetamine that recently had crossed the Mexican border. 479 F.3d at 781. On appeal, the defendant argued

13

that because he personally did not drive the truck over the border, he could not be subject to the importation enhancement.[3] *Id*. at 784. We rejected the argument that the importation enhancement applied "to only those defendants who themselves transport methamphetamine across the border." *Id*. at 784. We reasoned that the enhancement was not limited to individuals who personally transported methamphetamine because the Sentencing Commission used the "more inclusive language 'involved the importation,'" even though it could have used the more restrictive language it used in a different subsection. *Id*.; *compare* U.S.S.G. § 2D1.1(b)(5) (applying a two-level enhancement if the offense "involve[s] the importation of . . . methamphetamine"), *with* U.S.S.G. § 2D1.1(b)(3) (applying an enhancement "[i]f the defendant unlawfully imported or exported a controlled substance").

Silva acknowledges that the importation enhancement applies if the methamphetamine was imported from Mexico, even if he did not personally transport it across the border. But he argues that the district court erroneously imposed the enhancement because the evidence did not establish that the methamphetamine was imported from Mexico. He also asserts that his case is factually distinguishable from *Perez-Oliveros* because he was incarcerated during

---

[3] At the time that we decided *Perez-Oliveros*, this enhancement appeared at U.S.S.G. § 2D1.1(b)(4).

14

the drug deals involved in the instant case, whereas Perez-Oliveros had personally driven the drug-laden truck.  We disagree and conclude that the district court's application of § 2D1.1(b)(5) was appropriate.  Although Silva was in prison during the drug deals, the record contains significant evidence linking him to ongoing methamphetamine operations in Mexico.  Specifically, the evidence showed that Silva discussed drug deals—which took place in the United States—with Pollo, who was located in Mexico and in a cartel.  Additionally, Silva told one associate that Pollo was his drug supplier.  In light of that evidence, it was not clear error for the district court to conclude that the methamphetamine that was the subject of the drug deals came from Mexico.  *See Matos-Rodriguez*, 188 F.3d at 1309.

Alternatively, Silva argues that "it cannot be determined whether the district court made a factual finding beyond that the offense involved meth imported from Mexico."  Appellant's Br. at 25.  But under *Perez-Oliveros*, all the court was required to determine was that the offense "involved" the importation of methamphetamine.  *See Perez-Oliveros*, 479 F.3d at 784.  Regarding the importation enhancement, the district court noted that it had read the sentencing memoranda, heard argument from the parties, and admitted evidence showing that Silva communicated with Pollo, who was in Mexico, about the drug deals.  Thus,

there was a sufficient factual basis for the court to conclude that the enhancement was appropriate.  *See Askew*, 193 F.3d at 1183.  We affirm on this ground.[4]

## C. Procedural and Substantive Reasonableness of Total Sentence

Finally, Silva challenges his sentence as procedurally and substantively unreasonable.  In reviewing the reasonableness of a sentence, we first consider whether the district court committed any significant procedural error.  *Gall*, 552 U.S. at 51.  A sentence is procedurally unreasonable if a district court commits an error "such as failing to calculate (or improperly calculating) the Guidelines range, . . . failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ."  *Id.*[5] Procedural reasonableness does not require that a court recite or discuss each of the

---

[4] In *Perez-Oliveros*, we "decline[d] to define the exact contours of what it means for an offense" to involve the importation of methamphetamine.  *Perez-Oliveros*, 479 F.3d at 784. Although the outer boundaries of the enhancement's applicability are unclear, we conclude that Silva had the "requisite level of involvement" in the drug deals to support the enhancement because the evidence showed that he worked directly with a cartel member in Mexico to bring into the United States methamphetamine that he then distributed.  *Id.*

[5] Under § 3553(a), the district court is required to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of the statute.  18 U.S.C. § 3553(a).  These purposes include the need to:  reflect the seriousness of the offense; promote respect for the law; provide just punishment; deter criminal conduct; protect the public from the defendant's future criminal conduct; and effectively provide the defendant with educational or vocational training, medical care, or other correctional treatment.  18 U.S.C. § 3553(a)(2).  The court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims.  *Id.* § 3553(a)(1), (3)–(7).

§ 3553(a) factors. *See United States v. Bonilla*, 463 F.3d 1176, 1182 (11th Cir. 2006).

When reviewing a sentence for substantive reasonableness, we examine the totality of the circumstances, including "whether the statutory factors in § 3553(a) support the sentence in question." *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008). "We will not second guess the weight (or lack thereof) that the judge accorded to a given factor under § 3553(a), as long as the sentence ultimately imposed is reasonable in light of *all* the circumstances presented." *United States v. Snipes*, 611 F.3d 855, 872 (11th Cir. 2010) (alterations adopted) (internal quotation marks omitted). We may vacate a sentence only if we firmly believe that the district court "committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (internal quotation marks omitted). We may not set aside a sentence "merely because we would have decided that another one is more appropriate." *Id.* at 1191. We apply no presumption of reasonableness to sentences within the Guidelines range, but we ordinarily expect such sentences to be reasonable. *United States v. Stanley*, 739 F.3d 633, 656 (11th Cir. 2014). The party challenging the sentence bears the burden of showing it is unreasonable. *United States v. Tome*, 611 F.3d. 1371, 1378 (11th Cir. 2010).

17

The district court imposed no procedurally or substantively unreasonable sentence. *Gall*, 552 U.S. at 41. Beyond arguing that the importation enhancement was improper, Silva has not asserted that the court miscalculated the Guidelines range. Nor has he argued that the court neglected to consider the § 3553(a) factors, based the total sentence on clearly erroneous facts, or failed to explain its sentencing decision. Rather, Silva argues that his total sentence was not "proportionate to the crime for which [he was] convicted," as his case did not involve a "major drug conspiracy." Appellant's Br. at 27–28. That argument is refuted by the record, which shows that Silva (1) committed the offenses while he was incarcerated for another drug trafficking crime and (2) coordinated with multiple associates to organize the distribution of over 65 kilograms of methamphetamine. Notably, the court imposed a total sentence below the Guidelines range of life plus 60 months. *See Stanley*, 739 F.3d at 656. Thus, Silva's total sentence was within the range of reasonable sentences dictated by the facts of the case, especially considering the scope of the drug conspiracy, the quantity of methamphetamine involved, and his criminal history. *See Irey*, 612 F.3d at 1190. We therefore conclude that Silva has not met his burden of showing that his total sentence was unreasonable. *See Tome*, 611 F.3d. at 1378. Accordingly, we affirm his 420-month total sentence.

## IV.    CONCLUSION

For the foregoing reasons, we affirm Silva's convictions and sentences.

**AFFIRMED.**