[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10009
_____

D.C. Docket No. 0:12-cr-60080-RNS-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

HARVEY ZITRON,

Defendant - Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 21, 2016)

Before ED CARNES, Chief Judge, MARTIN, Circuit Judge, and WALTER,[*]
District Judge.

_____

[*] Honorable Donald E. Walter, United States District Judge for the Western District of
Louisiana, sitting by designation.

PER CURIAM:

After a five-day jury trial, Harvey Zitron was convicted of five counts of filing false tax returns, three counts of using an unauthorized access device, and two counts of aggravated identity theft.  He challenges his convictions and sentence.

## I.

Zitron operated a company called Millennium Republic that sold chemical products.  In 2002, he suggested to one of Millennium's employees, Cynthia Gentner, that she take over the company.  She agreed.  Gentner operated the business under the names of two corporations that she formed, Cyn-Lex and Granite Industries.  Despite the apparent change in ownership, Gentner testified that she still "did everything [Zitron] asked [her] to do."  From 2002 to 2003, at Zitron's behest, Gentner deposited company checks into her personal account, took out cash, and gave that cash to Zitron.[1]

Zitron came up with another check-cashing scheme in 2003.  He instructed Gentner to write checks from Cyn-Lex and Granite Industries to a man named "Charles Sohrabel."  "Charles Sohrabel" was the alias of Zitron's friend, Charles

---

[1] That arrangement ended because Gentner feared the effect it might have on her tax returns.

2

Schnabel.[2]  Gentner agreed, even though she knew that "Charles Sohrabel" was

Schnabel's alias and that Schnabel did not work for either company.  Zitron then

told Gentner and Schnabel to go to a convenience store that offered a check-

cashing service.  Schnabel initially cashed the checks in person, but he later called

the storeowner and told him that Gentner was authorized to cash the checks on his

behalf.[3]

Between January 2003 and December 2005, Gentner cashed 265 checks for

Zitron at that store, totaling $2,566,981.60.  Gentner then gave that cash to Zitron.

The scheme ended after the storeowner told Gentner that he would not cash any

more checks unless Schnabel accompanied her and provided valid identification

(which he never did).

Zitron did not report a penny of that $2,566,981.60 on his income tax filings,

even though it was taxable income (according to the government's tax expert who

testified at trial).  Instead, on income tax forms that he filed for 2003, 2004, and

2005, he reported negative amounts of adjusted gross income.  But during those

years, he deposited a total of $820,513.75 in cash into several bank accounts:

$425,728.00 into an account held in his own name; $202,277.00 into a joint

---

[2] Schnabel had used another person's social security number to obtain a fake Virginia driver's license in the name of "Charles Sohrabel."

[3] Schnabel did not live in Florida, but every time he visited he would pre-sign 10 to 20 checks each for Cyn-Lex and Granite Industries.

3

checking account he owned with a friend; and $192,508.75 into an account he controlled but held in his son Jordan's name (even though Jordan barely remembered opening it and never put any of his own money into it).

Zitron not only failed to report any of the income from his check scheme, he also misused his ex-wife's and son's names and social security numbers to obtain credit cards:  one in his ex-wife's name in 2006, and two in his son's name in 2009.  He did not have their permission to use their personal identifying information in that way.  They discovered the existence of the credit cards only after Zitron had racked up substantial amounts of debt on them.

Zitron was initially charged with two counts of filing false tax returns.  The government eventually added more charges, bringing the total to five counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1), three counts of using an unauthorized access device, in violation of 18 U.S.C. § 1029(a)(2), and two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  Zitron moved to sever the tax counts from the access device and identity theft counts, but the district court denied the motion.  After a five-day trial, the jury found Zitron guilty on all counts, and the court sentenced him to 81 months in prison.  This is his appeal.

## II.

Zitron contends that the tax counts were improperly joined with the access device and identity theft counts under Federal Rule of Criminal Procedure 8(a).[4] Alternatively, he contends that even if joinder was proper, the tax counts should have been severed from the others under Rule 14(a) because of the joinder's prejudicial effect on him.[5]

We will reverse a conviction based on improper joinder under Rule 8(a) only if it "affects substantial rights and . . . results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." United States v. Watson, 866 F.2d 381, 385 (11th Cir. 1989) (alteration in original) (quotation marks omitted).  Similarly, we will reverse a conviction based on the district court's refusal to sever counts under Rule 14(a) only if the defendant "received an unfair trial and suffered compelling prejudice."  United States v. Walser, 3 F.3d 380, 386 (11th Cir. 1993) (quotation marks omitted).

Zitron argues that the trial of the access device and identity theft counts with the tax counts together was prejudicial because it allowed the government to

---

[4] Rule 8(a) provides that the indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged — whether felonies or misdemeanors or both — are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."

[5] Rule 14(a) provides that if "the joinder of offenses . . . appears to prejudice a defendant . . . the court may order separate trials of counts."

5

present evidence that he furtively used his family members' personal identifying information for his own financial advantage and the jury may not have been able to consider the evidence of the different crimes separately.  The evidence of the family-related credit card crimes, he asserts, left the jury confused, hostile toward him, and more likely to convict him on the tax counts.  We are not persuaded.

Zitron has not shown that he suffered actual prejudice that affected his substantial rights, as would be necessary to find reversible error under Rule 8(a). There is nothing in the record indicating that the jury was confused, hostile, or more likely to convict on the tax counts because of the evidence of the other crimes.  See Watson, 866 F.2d at 385–86.  The evidence presented to convict him on the identity theft and access device counts would have been admissible against him in a separate trial on the tax counts.  See id.

Zitron also has not shown that he suffered compelling prejudice from the joinder of the claims, as would be required under Rule 14(a) in order to find that the district court abused its discretion in refusing to sever the tax counts from the other counts.  The evidence was sufficient to convict Zitron on all of the counts. Cf. Walser, 3 F.3d at 387 (concluding that a defendant did not suffer compelling prejudice partly because "the evidence as to each count fully supported a finding of guilt").  Finally, the court instructed the jury that each count "charg[ed] a separate crime," that it "must consider each crime and the evidence relating to it

6

separately," and that its finding of guilty or not guilty on one count "must not affect [its] verdict for any other crime." See United States v. Pierce, 733 F.2d 1474, 1477–78 (11th Cir. 1984) (per curiam) (finding no prejudice because the district court "properly instructed the jury" on how to use the evidence and because the government presented sufficient evidence to convict the defendant). And "[a]fter all, we must presume that juries follow their instructions." Johnson v. Breeden, 280 F.3d 1308, 1319 (11th Cir. 2002). The instructions did cure any error in trying the counts together. Cf. United States v. Barsoum, 763 F.3d 1321, 1337–38 (11th Cir. 2014) (noting that the district court "properly instructed the jury to consider each count separately" in finding that it did not abuse its discretion in denying a motion to sever); Walser, 3 F.3d at 387 ("[I]f the possible prejudice may be cured by a cautionary instruction severance is not required.").

Because Zitron has not shown actual prejudice, we will not reverse for improper joinder under Rule 8(a). He has also not shown compelling prejudice, and we will not reverse for failure to sever under Rule 14(a).

## III.

Zitron next contends that two statements made by the government's tax expert during his testimony violated his Fifth Amendment right to remain silent and also improperly shifted the government's burden of proof.

7

One of those statements was made on Zitron's cross-examination of the witness.  Defense counsel asked him:  "[I]f the cash that was deposited into the . . . joint account and the Jordan Zitron joint account didn't come from the Charles Sohrabel checks, that would also change your expert opinion, correct?"  The witness replied that if the cash "didn't come from the Sohrabel checks, usually I would ask the question, well, where is this money coming from?  And if the defendant can explain it — cannot explain it, it still would be income unless he can say otherwise."

The other statement was made on the government's re-direct examination of that expert.  The prosecutor asked him if there was any indication during trial that Zitron "disclosed to his CPA the cash deposits to his bank accounts."  The witness replied:  "Nothing as far as I heard in this trial has shown that the CPA — you know, that the taxpayer disclosed the cash deposits in the bank, in his own bank account that he was aware of."

## A.

A witness impermissibly comments on a defendant's right to remain silent if the "remark was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's silence."  United States v. Guerra, 293 F.3d 1279, 1289 (11th Cir. 2002) (quotation marks omitted).  To determine the "natural and necessary effect of allegedly impermissible comments, we must

8

examine the comments in the context within which they were made." Williams v. Wainwright, 673 F.2d 1182, 1184 (11th Cir. 1982).

The expert witness, in one of his answers, did raise the question of whether the defendant could explain where the money came from, if not from the Sohrabel checks. But he did so in answer to a question during cross-examination. And his answer was, in effect, that absent some other explanation the cash would be treated as income. The witness did not directly refer to Zitron failing to testify. Cf. Williams, 673 F.2d at 1185 (deciding that the jury would not have necessarily taken a prosecutor's statement as a comment on the defendant's failure to testify because no "direct mention was made of the [defendant's] failure to testify"). The other statement, which came during re-direct examination, was more on the absence of any evidence that Zitron had disclosed the cash deposits to his CPA, something the CPA could have testified about. That was about the failure of the defense to produce evidence, not the failure of Zitron to testify. See Watson, 866 F.2d at 386 ("A comment on the failure of the defense, as opposed to the defendant, to counter or explain the testimony presented or evidence introduced does not violate the defendant's [Fifth Amendment] right not to testify."). Taken in context, neither statement was an impermissible comment on Zitron's right to remain silent.

B.

Nor did the comments improperly shift the burden of proof.  Prosecutors "must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992).  A comment that is "so prejudicial as to shift the burden of proof" sometimes requires reversal.  Id. But any potential prejudice can be cured by an appropriate instruction.  Id. at 1087 ("This [C]ourt has held that the prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof.").  Putting aside the obvious fact that the expert witness was not a prosecutor, the court's instruction that Zitron did "not have to prove his innocence or produce any evidence at all" and that the government had to "prove guilt beyond a reasonable doubt" cured any prejudice that may have resulted from the witness's comments.

## IV.

Zitron's final challenge to his conviction is that the evidence was insufficient to convict him of the two counts of aggravated identity theft under 18 U.S.C. § 1028A(a)(1).  That statute provides that "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person" shall be

punished for the underlying felony and receive a two-year term of imprisonment. 18 U.S.C. § 1028(A)(a)(1).[6]  Arguing that "knowingly" modifies the phrase "without lawful authority," Zitron asserts that the government presented insufficient evidence that he knowingly acted without lawful authority when he used his son Jordan's personal identifying information because it was a common family practice for him to take out credit cards in his children's names.

Although we normally review <u>de novo</u> challenges to the sufficiency of the evidence, we review "unpreserved objections . . . to the sufficiency of the evidence" only for plain error.  <u>United States v. Joseph</u>, 709 F.3d 1082, 1093 (11th Cir. 2013) (citations omitted).  Zitron moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 based on insufficiency of the evidence,[7] but he did not make the specific argument in that Rule 29 motion that he makes here. Because Zitron "did not clearly object to the trial court on this insufficient-evidence basis," we review only for plain error.  <u>Id.</u> at 1103 (quotation marks omitted).

---

[6] The underlying felony here is the use of an unauthorized access device (based on Zitron's use of his ex-wife's and son's personal identifying information), in violation of 18 U.S.C. § 1029(a)(2). <u>See</u> 18 U.S.C. § 1028A(c)(4).

[7] Rule 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

11

The Supreme Court has held that "§ 1028A(a)(1) requires the [g]overnment to show that the defendant <u>knew</u> that the means of identification at issue belonged to another person." <u>Flores-Figueroa v. United States</u>, 556 U.S. 646, 657, 129 S. Ct. 1886, 1894 (2009) (emphasis added). Though we have not clarified the exact application of the knowledge requirement to the "without lawful authority" element, we have found that "the phrase 'without lawful authority' prohibits methods of obtaining another person's identification beyond stealing." <u>United States v. Hurtado</u>, 508 F.3d 603, 607 (11th Cir. 2007) (per curiam), <u>abrogated on other grounds by</u> <u>Flores-Figueroa</u>, 556 U.S. 646, 129 S. Ct. 1886. The government established the "without lawful authority" element in two ways—with testimony from Jordan that Zitron did not have permission to use his identity, and with evidence that Zitron used Jordan's means of identification for an unlawful purpose. This evidence provides sufficient support that Zitron acted "without lawful authority," so that any error cannot be considered plain. Because there was no error that was plain, we need not address the other requirements of the plain error rule.

## V.

Zitron challenges his sentence as procedurally unreasonable, contending that the district court erred in calculating the amount of tax loss and in imposing a two-level role enhancement.

12

A.

The presentence investigation report calculated the amount of tax loss using the full amount of the Sohrabel checks — $2,566,981.60. Under the sentencing guidelines, that amount yielded a tax loss figure of $973,249.00 and a base offense level of 20 under U.S.S.G. § 2T4.1(H). Over Zitron's objection, the district court adopted that tax loss figure. Zitron argues that using the full amount of the Sohrabel checks to calculate the tax loss figure was error because the government proved that Zitron actually deposited only $820,513.75.[8]

We review the district court's calculation of the tax loss figure for clear error. United States v. Patti, 337 F.3d 1317, 1323 (11th Cir. 2003). The court must "simply make a reasonable estimate" of the tax loss "based on the available facts." U.S.S.G. § 2T1.1 cmt. n.1. The "tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." U.S.S.G. § 2T1.1(c)(1).

The "object" of Zitron's check-cashing scheme was the full amount of the Sohrabel checks, not just the $820,513.75 that ended up in the bank accounts he owned or controlled. The government's tax expert testified at trial that he examined Cyn-Lex's and Granite Industries' bank records, as well as the checks

---

[8] Using $820,513.75 to calculate the tax loss figure would have yielded a base offense level of 18 under the guidelines. U.S.S.G. § 2T4.1(G).

themselves, to calculate the amount of those checks. He also presented check schedules to show that the total amount of the checks was $2,566,981.60. Nothing in the guidelines required the district court to consider only the checks that Zitron actually deposited. And it does not matter (as Zitron alleges) that some of the $2,566,981.60 might later have gone to Schnabel as a "commission" for his help in the scheme, since Gentner testified that she gave all the cash to Zitron. See U.S.S.G. § 2T1.1 cmt. n.2 ("In determining the total tax loss attributable to the offense . . . all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan . . . ."). The district court did not clearly err in finding that Zitron received the full $2,566,981.60, even if only a portion of that money went into his account.

## B.

Zitron argues that the district court erroneously applied a two-level enhancement based on his role as an "organizer, leader, manager, or supervisor in [a] criminal activity" involving at least one "participant." U.S.S.G. § 3B1.1(c), cmt. n.1–2. He asserts that because he was the only one who actually filed false tax returns, no one else was a "participant" for purposes of that enhancement.

"A defendant's role as an organizer or leader is a factual finding that we review for clear error to determine if the enhancement . . . was applied appropriately." United States v. Ramirez, 426 F.3d 1344, 1355 (11th Cir. 2005).

14

The government must prove the facts supporting the enhancement by a preponderance of the evidence.  United States v. Perez-Oliveros, 479 F.3d 779, 783 (11th Cir. 2007).

A "participant" under § 3B1.1 is "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 cmt. n.1.  In assessing whether Gentner and Schnabel were "criminally responsible," we can consider any of their acts directed by Zitron that were "part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2); id. § 3B1.1 introductory cmt.[9]  In other words, it makes no difference that Gentner and Schnabel did not actually help Zitron file the false tax returns — it is enough that they knowingly assisted in some way in Zitron's criminal tax scheme.  See United States v. Duperval, 777 F.3d 1324, 1336–37 (11th Cir. 2015) (upholding a § 3B1.1 enhancement because the participant in the scheme "knew that the money was the proceeds of an unlawful activity"); see also United States v. Hall, 101 F.3d 1174, 1178 (7th Cir. 1996) ("[A] party who gives knowing aid in some part of the criminal enterprise is a 'criminally responsible' participant under the [g]uidelines."); United States v. Boutte, 13 F.3d 855, 860 (5th Cir. 1994) (same).

---

[9] Section 1B1.3(a)(2) applies only to offenses "for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts."  Tax offenses under § 2T1.1 fall under that category of offenses.  U.S.S.G. § 3D1.2(d).

The government showed by a preponderance of the evidence that Gentner and Schnabel knowingly assisted Zitron in committing the tax crimes. The check-cashing arrangement was part of the same "common scheme or plan," U.S.S.G. § 1B1.3(a)(2), as the tax crimes. Indeed, Zitron's failures to report the cash from those checks were the tax crimes. Gentner and Schnabel played integral roles in that scheme. Gentner wrote the Cyn-Lex and Granite Industries checks to "Charles Sohrabel," even though she knew that was Schnabel's alias and that he did not work for either company. She wrote the checks and cashed them whenever Zitron told her to. And Schnabel agreed to use his alias for the checks and, at least at the beginning of the scheme, cashed the checks in person. Given all of that evidence, the district court did not clearly err in finding that at least one (and probably both) of them knew that Zitron was engaged in a scheme to hide the source of his income for tax purposes and that they helped him do it. For those reasons, the court did not clearly err in applying the organizer or leader enhancement.

**AFFIRMED.**