[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13507

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

QUINCETTA YVONNE CARGILL,
a.k.a. Queen,
a.k.a. Tonya,
a.k.a. Angela Scott,
a.k.a. Antela Scott,
a.k.a. Quincet Tucker,
a.k.a. Quincetta Tucker,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:17-cr-00356-RDP-JHE-1

_____

Before WILSON, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Quincetta Cargill appeals her convictions following a bench trial for conspiracy to commit mail and wire fraud and attempted witness tampering. She argues on appeal that (1) the district court erred in permitting her to proceed *pro se* at the bench trial because her waiver of her constitutional right to counsel was not knowing and voluntary; (2) the district court erred in denying her motion for judgment of acquittal on the attempted witness tampering charge because the evidence was insufficient to sustain a conviction; and (3) the district court erred in attributing the total loss amount to Cargill when calculating her base offense level under the Sentencing Guidelines. After review, we affirm.

## I.    Background

In 2017, a federal grand jury indicted Cargill and several co-conspirators on one count of conspiracy to commit mail and wire

fraud based on the group's filing of fraudulent income tax returns and receipt of tax refunds to which they were not entitled. The district court appointed counsel to represent Cargill. Approximately nine months later, Cargill filed a *pro se* motion requesting that alternative counsel be appointed, citing various conflicts she had with her present counsel. A magistrate judge held a hearing on the motion and denied it without prejudice. However, a few months later, counsel filed a motion to withdraw, stating that he went to the jail to meet Cargill and she refused to meet with him. Cargill filed a simultaneous motion again requesting that new counsel be appointed to her case, citing her frustration with present counsel's representation and with the fact that whenever she filed *pro se* documents with the court, those documents were stricken.[1] Following a hearing on the motions, the magistrate judge granted the motion to withdraw, and appointed new counsel.

A few months later, Cargill again filed a *pro se* motion complaining of her second counsel's representation, but shortly thereafter filed a letter stating she had met with counsel, was satisfied with counsel's services, and was withdrawing her motion. The government then notified the district court of a potential conflict of interest concerning counsel's representation

---

[1] The record reflects that throughout the district court proceedings, Cargill continued to file *pro se* documents when represented by counsel, despite the court's repeated admonition that because she was represented by counsel, her *pro se* filings would not be considered.

of Cargill,[2] and Cargill filed a *pro se* letter opposing counsel's continued representation of her. After a lengthy colloquy with Cargill at the hearing on this matter, the district court explained that, although it did not believe there was a conflict of interest, in light of Cargill's concerns and insistence that she receive new counsel, it removed second counsel and appointed new counsel for a third time.

Cargill continued to file *pro se* documents however, and, within three months, appointed counsel filed a motion to withdraw, citing a breakdown in the attorney-client relationship. Shortly, thereafter, Cargill filed a *pro se* motion expressing concerns with the effectiveness of appointed counsel's representation. The magistrate judge held a hearing, and based on counsel's representations that he could not continue to represent Cargill due to her efforts "to sabotage [him] and the work [he was] doing not only for her" but also the fact that she had made efforts to contact his other clients and impugn his work on their cases, the magistrate judge granted counsel's request to withdraw, and appointed a fourth attorney to represent Cargill.

---

[2] Specifically, the Assistant United States Attorney on behalf of the government advised the district court that Cargill's counsel was an anticipated witness for the government in an unrelated habeas case. However, the government stated that it was notifying the court of the circumstances out of an abundance of caution, and it did not believe there was a conflict of interest. Cargill's counsel filed a response indicating that she also did not believe there was a conflict of interest.

Within two months of the fourth counsel's appointment, however, Cargill, through counsel, filed a motion requesting permission to proceed *pro se* with current counsel serving as "standby" or "hybrid" counsel, and requested a *Faretta*[3] hearing. The government opposed Cargill's request for "hybrid representation."

A magistrate judge held a hearing on Cargill's motion. The magistrate judge explained that Cargill had a right to represent herself *pro se*, but that before the court could grant her request, it needed to "make certain determinations," including whether she was "doing this knowingly and voluntarily" and whether she understood "the obligation[s]" and "potential consequences" of representing herself. When asked what she was requesting, Cargill explained that she wanted to "take on a more active role in the case" "as a *pro se* defendant." She further elaborated:

> I'm requesting the right to a self-representation and waiv[ing] in [sic] my right [to] Sixth Amendment . . . counsel but at the same time requesting to work with co-counsel, Attorney Bramer, as hybrid representation co-counsel to take on the more difficult parts or the tactical parts of the procedure such as Federal Rules of Evidence and helping with the objections and tactical parts . . . .

The magistrate judge then stated:

---

[3] *Faretta v. California*, 422 U.S. 806 (1975).

You understand that proceeding in that manner given what you're charged with really doesn't make sense? And that's why we are here to make sure that that's what you want to do, because giving up your right to legally trained adequate counsel is a big deal given the charges you're facing and the potential consequences of doing so.

. . .

You understand [Attorney Bramer is] not going to be your co-counsel; you're representing yourself? That's what you're asking the court to do. He would be assisting you if the court allowed him to assist you . . . . I could let you do what you've asked, which is to represent yourself, and have him sit as advisory counsel or standby counsel . . . . Either way, you don't have a right to hybrid counsel; you understand that?

Cargill confirmed that she understood. The magistrate judge then asked for Cargill's counsel's opinion on the matter, and counsel expressed that he believed that, although she was not entitled to hybrid representation, hybrid counsel was in Cargill's "best interest." The government opposed Cargill's request.

The magistrate judge noted that Cargill's competency had been evaluated and she was deemed competent to stand trial, and asked her counsel whether Cargill appeared to understand what she was doing and could assist in her own defense. Counsel expressed that Cargill was "very intelligent," "a sharp thinker," "articulate," understood "what's going on," and was "very aware

of the case and all the aspects of the case." The magistrate judge again asked Cargill whether she "desire[d] to represent herself," and Cargill stated:

> this is a knowing and intelligent decision to relinquish my right to counsel, to exercise my right to self-representation. However, I do know that it is not by right that I receive either hybrid, standby, or assistant counsel. I do ask the court to consider that. But this is a knowing, intelligent decision voluntarily to exercise my right and waive[] my Sixth Amendment right to counsel.

She confirmed that she wanted to represent herself "regardless of [the] circumstances." She stated that, although she had no formal legal education, she had learned "a lot of things" in the last two years since being charged and had "studied day and night."

The magistrate judge then reviewed the charge against her and the possible penalties, and Cargill stated that she understood. The magistrate judge explained that, if Cargill represented herself, the court could not help or give her advice on how to try the case, and that she would need to become familiar with the Federal Rules of Evidence and Criminal Procedure. She stated that she understood. The magistrate judge advised Cargill that self-representation or the hybrid or standby counsel situations were not in Cargill's best interest, and he urged her "to not represent [herself]." Cargill maintained that she understood, but that she desired to represent herself, and that her decision was "entirely

voluntary." Accordingly, the magistrate judge determined that she had knowingly and voluntarily waived her right to counsel and explained that he would recommend that her motion be granted.

The magistrate judge then issued a report and recommendation, recommending that Cargill be allowed to proceed *pro se*, and that her request for hybrid representation—although very rare—be granted. The district court agreed and granted Cargill's motion over the government's objections.

Approximately two months later, the government filed a superseding indictment that added a new charge of attempted witness tampering involving witness Gerald Starks. Cargill pleaded not guilty and waived her right to a trial by jury.

The case proceeded to a bench trial, at which Cargill represented herself with the assistance of hybrid counsel. In relevant part, at trial, the government called an IRS agent who testified that the investigation revealed that Cargill and her co-conspirators would solicit individuals under the guise that they were "operating a grant program or a not-for-profit program that would give money for various reasons," such as financial aid for college, and financial assistance for those impacted by the economic recession. She and her co-conspirators would then use the personal identifying information supplied by individuals to file false tax returns and have the refunds electronically deposited into various bank accounts. The investigation revealed that 54 bank accounts were involved in the scheme, which were tied to

$1,096,000 in tax refunds from the IRS.  Cargill personally controlled four of these accounts, which received $171,000 in tax refunds.

The agent also testified that during his investigation he learned of "potential threats" to witnesses made by Cargill, as evidenced in a recorded jail phone call and various e-mails.  The recorded jail phone call that allegedly contained a threat to a witness was played for the court.  In the call, Cargill's brother indicated that he received some mail from her, and the two discussed that the documents contained information from Gerald Starks, a potential witness.  Cargill wanted the information to be publicly disseminated to expose that Gerald was a snitch.  Specifically, Cargill said that she was "up against a wall" and that witnesses Gerald and Tyronca Starks (Cargill's cousin) needed to "have some discomfort too."[4]  Cargill and her brother brainstormed how to get the material onto the internet, spoke generally about the materials—including grand jury testimony— and commented on how the materials showed that the Starks lied to investigators.  Cargill stated that she wanted the "whole conversation to go public" someplace where she could "tag" people to see the conversation.  Cargill said that Gerald told investigators that people from a motorcycle club worked for Cargill.  Cargill said that the motorcycle club did not know her

---

[4] Throughout the call, Cargill referred to Gerald and Tyronca Starks by their nicknames, Goo and Punkin'.

and if they learned that Gerald was a confidential informant, then they "wouldn't know him either." Cargill said that the motorcycle club would learn that Gerald was a confidential informant once she was able to get the materials posted and "linked to [her] page." Her brother said he would try to post the materials to an anonymous Facebook page. Cargill said that someone else was operating her Facebook account and that she would write to that person to tell her what to say. Cargill asked her brother to copy the materials she sent to him and send them to the president of the motorcycle club to show the club that Gerald was a confidential informant and might be giving information about them to law enforcement. Cargill stated she wanted to show the motorcycle club that its "problem" was Gerald.

Cargill's sister, Kiara, testified that Cargill reached out to her several times from jail asking Kiara for the address of the Low Riders Motorcycle Club. Cargill told Kiara that she needed the address to give to their brother so that he could get some mail to the club. Kiara's testimony about the correspondence was corroborated by copies of e-mails she received from Cargill.

Gerald Starks (a.k.a. "Goo") testified, as relevant to this appeal, that he was charged in relation to the fraudulent tax scheme case, and he pleaded guilty. At Cargill's direction, he opened a bank account to receive tax refunds, and he would withdraw a portion of the refunds deposited to give to Cargill and he would keep a portion as his "pay." On cross-examination,

Gerald testified that he spent time with the Low Riders Motorcycle Club. When asked whether he was ever threatened by Cargill's husband, Darryl Harris (referred to as "Big Country"), Gerald testified he was not threatened personally, but that Big Country went to the motorcycle club, when Gerald was not there, and told the club that Gerald "was a snitch." Gerald testified that he did not feel threatened by the motorcycle club. He also confirmed that Cargill had not personally threatened him.

At the close of the government's case, Cargill moved for a judgment of acquittal, arguing in relevant part, that a judgment of acquittal was appropriate on the witness tampering charge because the telephone call "was just banter back and forth with her brother" and Cargill "used no intimidation against any witness." The district court overruled the motion, concluding that there was sufficient evidence from which the trier of fact could reasonably conclude that criminal conduct occurred.

Cargill then testified, with regard to the witness tampering charge, that she was "angry" during the jail phone call with her brother, but that she did not threaten Gerald. She clarified "I didn't say I wanted [the motorcycle club] to do any harm to Goo, because Goo is my family. I wanted them to make Goo be a man and tell the truth. And that's all I kept saying." She explained that when she stated she wanted Gerald to be in "discomfort," she did not mean that she wanted him killed or beaten up.

Cargill then moved to submit a second recorded jail phone call between her and her husband, Big Country, arguing that the

call would show that she was under duress and trying "fix the situation outside" "to save others" when she tried to contact the motorcycle club.  The district court admitted the call over the government's hearsay and relevance objections.  In the call, Cargill's husband stated that he asked the motorcycle club to send a letter to Cargill's lawyer stating that they were lying about Cargill's involvement, and if they did not send the letter then they needed to "come for [him]" because he would "come and see" them.

On cross-examination, Cargill admitted that she knew that Gerald might be called as a witness and that he was involved with the motorcycle club.  She admitted that she sent her brother copies of interviews and reports that she obtained during discovery to give to the motorcycle club because she wanted Gerald to feel discomfort.  With the materials Cargill mailed to her brother, she also included a letter to the motorcycle club, which stated "make the call and tell the truth or make that punk-ass coward be a man and tell the truth."  She clarified that "make the call" meant that she wanted them to call her "attorney and let him know that somebody will come here and tell the truth."

Following the defense's case, Cargill, through her hybrid counsel, renewed her motion for judgment of acquittal, which the district court denied.  The district court found Cargill guilty on both counts.

Prior to sentencing, the United States Probation Office prepared a presentence investigation report (PSI), which indicated that the total tax loss in the case was $1,096,668.68, which resulted in a base offense level of 20. Cargill's resulting guidelines range was 168 to 210 months' imprisonment. Cargill raised numerous objections to the PSI, including an objection to the loss amount used to determine her base offense level, arguing that IRS records had two different unspecified loss numbers—one for the "claimed loss" and one for the "actual loss."

At sentencing,[5] Cargill explained that she stood on her objection to the total loss amount and did not make additional argument. The district court did not directly address Cargill's objection to the total loss amount, but it implicitly overruled her objection when it concluded that the guidelines calculation in the PSI was correct. Cargill requested a sentence at the bottom of the guidelines range, and the government requested a sentence at the top of the guidelines range. The district court sentenced Cargill to concurrent terms of 180 months' imprisonment on each count to be followed by three years' supervised release. Cargill timely appealed.

---

[5] Cargill's sentencing hearing took place in June 2020, and she agreed to proceed by video teleconference. Due to technical difficulties that occurred, the first sentencing hearing was stopped after Cargill set forth her objections to the PSI, and the hearing was continued. At Cargill's second sentencing hearing, she requested a continuance, which was granted.

## II.     Discussion

### A. Whether Cargill's waiver of right to counsel was knowing and voluntary

Cargill argues that the district court erred in allowing her to proceed *pro se* because it failed to conduct a proper *Faretta* inquiry to ensure that she understood the risks and disadvantages of proceeding *pro se*. In particular, she faults the magistrate judge at the *Faretta* hearing for not exploring in depth whether she understood the charges against her and the potential defenses available.

We review *de novo* whether the defendant's waiver of the right to counsel was knowing and voluntary. *United States v. Garey*, 540 F.3d 1253, 1268 (11th Cir. 2008) (*en banc*); *see also United States v. Hakim*, 30 F.4th 1310, 1318 (11th Cir. 2022). It is the government's burden to show the validity of the waiver. *Hakim*, 30 F.4th at 1318.

Under the Sixth Amendment, a criminal defendant has a right to counsel "at all critical stages of the criminal process." *Hakim*, 30 F.4th at 1321 (quotations omitted). However, the Sixth Amendment also implicitly grants a defendant the right to represent himself. *Faretta v. California*, 422 U.S. 806, 814, 819 (1975). "Because the constitutional rights to counsel and to self-representation cannot be exercised at once, a defendant can exercise one only if he waives the other." *Hakim*, 30 F.4th at 1322.

To waive the right to counsel, the "defendant must clearly and unequivocally assert the right of self-representation," and the waiver must be "knowing, intelligent, and voluntary." *United States v. Owen*, 963 F.3d 1040, 1048 (11th Cir. 2020) (quotations omitted). "The ideal method of assuring that a waiver is valid is for the trial court to conduct a pretrial [*Faretta*] hearing at which the accused is informed of the charges, basic trial procedures, and hazards of self-representation." *Id.* at 1049 (quotations omitted). But "[t]he ultimate test is not the trial court's express advice, but rather the defendant's understanding. As long as the record establishes that the defendant understood the risks of self-representation and freely chose to face them, the waiver may be valid." *Id.* (quotations and internal citation omitted). We have identified eight factors that we may consider to determine whether the defendant's waiver of the right to counsel was knowing and voluntary:

> (1) the defendant's age, educational background, and physical and mental health; (2) the extent of the defendant's contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges, possible defenses, and penalties; (4) the defendant's understanding of rules of procedure, evidence, and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which that counsel aided the defendant; (7) mistreatment or coercion of the defendant; and

(8) whether the defendant was trying to manipulate the events of the trial.

*Id.* Importantly, a "defendant's waiver may be valid even if some of these factors weigh in [her] favor." *Id.*

Here, the record confirms that the magistrate judge conducted a lengthy *Faretta* hearing and that Cargill was aware of the risks of representing herself and made a knowing, intelligent, and voluntary waiver of her right to the assistance of counsel. At the hearing, despite the magistrate judge's advice that Cargill representing herself would not be in her best interest and was ill-advised, Cargill repeatedly and insistently stated that she understood the risks and that her waiver was knowing and voluntary. The magistrate judge advised Cargill of the charge against her and the possible penalties, and Cargill confirmed that she understood. The magistrate judge also informed Cargill that, even though Cargill had no formal legal training, she would need to familiarize herself with the Federal Rules of Evidence and Criminal Procedure and that the court could not assist her with the case, and she confirmed that she understood.

Although Cargill argues that the district court should have done more to ensure that she understood the nature of the charge against her and the possible defenses, the district court's *Faretta* inquiry was proper and the relevant factors demonstrate that Cargill's waiver of her right to counsel and election to proceed *pro se* was knowing, intelligent, and voluntary. Furthermore, we note that the district court went a step further in attempting to

20-13507                Opinion of the Court                17

protect Cargill's rights by appointing "hybrid counsel" to assist her with the trial—an incredibly rare situation—as a defendant does not have a constitutional right to hybrid representation. *See Cross v. United States*, 893 F.2d 1287, 1291–92 (11th Cir. 1990). And the record establishes that Cargill received significant help from her hybrid counsel both in preparing for the bench trial and at the bench trial. Accordingly, we conclude that Cargill's waiver of her right to counsel was knowing, intelligent, and voluntary, and there was no Sixth Amendment violation.

B.    *Whether there was sufficient evidence for Cargill's attempted witness tampering conviction*

Cargill argues that the district court erred in denying her motions for judgment of acquittal on the attempted witness tampering charge because the evidence was insufficient to sustain her conviction given that Gerald Stark testified that he did not feel threatened and that he was never threatened by Cargill herself.

We review the sufficiency of the evidence to support a conviction *de novo*, considering the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the verdict.[6] *United*

---

[6] The government argues that we should review Cargill's challenge only for a "manifest miscarriage of justice" because she failed to argue below that the evidence was insufficient because Gerald testified that he did not feel threatened. The manifest miscarriage of justice standard, however, "does not apply unless the defendant makes *no* challenge to the sufficiency of the evidence after the close of all evidence." *United States v. Baston*, 818 F.3d

*States v. Moran*, 778 F.3d 942, 958 (11th Cir. 2015). "We review de novo the district court's denial of a motion for judgment of acquittal, applying the same standard used in reviewing the sufficiency of the evidence[.]" *United States v. Descent*, 292 F.3d 703, 706 (11th Cir. 2002). "[W]e will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." *United States v. White*, 663 F.3d 1207, 1213 (11th Cir. 2011) (quotation omitted).

It is illegal to use or attempt to use intimidation or threats with the intent to "influence, delay, or prevent the testimony of any person in an official proceeding." 18 U.S.C. § 1512(b)(1). "[W]hether a communication is a threat is a question of fact to be left to [the trier of fact]." *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (quotation omitted). "If a reasonable recipient, familiar with the context of the communication, would interpret it as a threat, the issue should go to [the trier of fact]." *Id.* (quotation omitted). The factfinder is free to conclude that the defendant intended to tamper with a witness's testimony, even if the witness did not actually feel threatened. *Id.*

There was sufficient evidence to convict Cargill of attempted witness tampering. The government presented a

---

651, 663 (11th Cir. 2016). Here, Cargill challenged the sufficiency of the evidence on the witness tampering charge, arguing that she "used no intimidation against any witness." That argument was sufficient to preserve her sufficiency challenge for appeal. Accordingly, we review the sufficiency of the evidence *de novo*.

phone call in which Cargill discussed exposing Gerald Starks as a confidential informant to the Low Riders motorcycle club because she wanted him to experience "some discomfort," and evidence was presented that Cargill's husband went to the motorcycle club and told them that Gerald "was a snitch." Additionally, in Cargill's letter to the motorcycle club, she asked the club to "make the call and tell the truth or make that punk-ass coward be a man and tell the truth." Regardless of Gerald's testimony that he did not feel threatened, viewing the evidence in the light most favorable to the government, the district court judge as the trier of fact was free to conclude that Cargill knowingly attempted to tamper with Gerald's testimony. Accordingly, we conclude that the evidence was sufficient to sustain Cargill's conviction.

### C. Whether the district court erred in attributing the total loss amount to Cargill when calculating her base offense level under the Sentencing Guidelines.

Cargill argues that the district court erred in using the total loss amount to determine her base offense level because there was no evidence that connected her to all of the accounts in question or the total loss amount. She maintains that she should be held accountable only for the total amount that came into accounts controlled or otherwise connected to her.

As an initial matter, we agree with the government that Cargill failed to preserve this specific issue for appeal. Although Cargill objected below to the total loss amount used to determine

her base offense level, she did so on different grounds, arguing that the IRS records had two different unspecified loss numbers—one for the "claimed loss" and one for the "actual loss." She did not argue that only the loss amount directly attributable to her should be used to determine her base offense level. Accordingly, her objection was not sufficient to preserve her present challenge, and we review for plain error. *See United States v. Ramirez-Flores*, 743 F.3d 816, 821 (11th Cir. 2014) (holding that "[t]he defendant . . . fails to preserve a legal issue for appeal if the factual predicates of an objection are included in the sentencing record, but were presented to the district court under a different legal theory" (alteration in original) (emphasis and quotations omitted)).

To establish plain error, Cargill must show "(1) that the district court erred; (2) that the error was plain; and (3) that the error affected [her] substantial rights. If all three conditions are met, we then decide whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014) (alterations adopted) (quotations and internal citations omitted).

Cargill cannot show that any error occurred, much less a plain error. "[T]ax loss is the total amount of loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed)." U.S.S.G. § 2T1.1(c)(1). The district court "must 'simply make a reasonable estimate' of the tax loss 'based on the available facts.'" *United States v. Zitron*,

810 F.3d 1253, 1261 (11th Cir. 2016) (quoting U.S.S.G. § 2T1.1 cmt. (n.1)).

"A defendant may be held responsible for the reasonably foreseeable acts of his co-conspirators in furtherance of the conspiracy." *United States v. Baldwin*, 774 F.3d 711, 727 (11th Cir. 2014). The district court "must determine the scope of the defendant's criminal activity prior to considering all reasonably foreseeable acts of co-conspirators." *Id.* In determining the scope of the defendant's criminal activity, the district "court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* (quotation omitted). However, if the record otherwise supports the reasonably foreseeable determination, a district court's "failure to make specific findings will not require vacating the sentence." *Id.*

Here, the record supports using the total loss amount to calculate Cargill's offense level. The IRS special agent testified that approximately $1,096,000 in IRS tax refunds was deposited in 54 bank accounts involved in the tax fraud scheme. Furthermore, at sentencing, the district court found that the scheme was "extensive" and that Cargill was an organizer or leader. This finding was supported by evidence that Cargill was a key member of the conspiracy, recruited several other members of the conspiracy, personally obtained the personal identifying information for filing the fraudulent returns, and had her co-conspirators withdraw money deposited in their accounts and

give it to her. Accordingly, even though only a portion of the total tax loss went into Cargill's accounts, the district court did not plainly err in attributing the total loss amount to Cargill for purposes of determining her base offense level because the evidence supported that Cargill was a key member who agreed to participate fully in the conspiracy, such that she can be held responsible for acts of her co-conspirators. *See Zitron*, 810 F.3d at 1261 (holding, under similar circumstances, that the district court did not err in attributing the total loss amount to defendant); *Baldwin*, 774 F.3d at 727–28 (same).

Accordingly, for the above reasons, we affirm Cargill's convictions and sentences.

**AFFIRMED.**