**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 24-11843

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

CHARLIE HOLLEY,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20373-RAR-1

————————————

Before MARCUS and WILSON, Circuit Judges, and JONES,[*] District Judge.

MARCUS, Circuit Judge:

———————————

[*] Honorable Steve C. Jones, United States District Judge for the Northern District of Georgia, sitting by designation.

On June 21, 2021, the defendant, Charlie Holley, armed with a scoped assault rifle and peering out of a second-floor window of his townhouse in Florida City, shot at and hit a United States Postal Service vehicle driven by a mail carrier.  After trial by jury, Holley was convicted on four criminal counts, including: assaulting a federal employee; brandishing and discharging a firearm in furtherance of a crime of violence; possessing a firearm as a convicted felon; and, possessing ammunition as a convicted felon.

Holley appeals his convictions and his ensuing sentence.  He claims that the district court erred in admitting five exhibits -- four clips of body-worn camera footage recorded by responding law enforcement officers and a 911 call -- that, he says, violated both the Federal Rules of Evidence and his rights under the Confrontation Clause of the Sixth Amendment.  Holley also challenges his sentence of 192 months' incarceration, arguing that the district court failed to adequately consider his mental health challenges at the time of the shooting.  After careful review and with the benefit of oral argument, we affirm Holley's convictions and sentence.

**I.**

*A.*

For over a decade, Charlie Holley lived in a Florida City townhouse (the "townhouse") in a residential neighborhood.  A family with children lived next door to Holley, and he became acquainted with the family's relative, Sheila Moss, an aunt, who visited the family regularly.  Holley also met and developed a cordial

relationship with Charlotte Wicker, a twenty-year mail carrier for the United States Postal Service ("USPS"), who delivered mail on the Florida City route.

On June 21, 2021, Moss drove to the townhouse community to visit her family. As she pulled into her family's driveway, Moss heard Holley yelling from a second-floor window of his townhouse. Holley screamed at Moss to leave, and when she attempted to identify herself, he pointed a scoped assault rifle at her through the apartment's window. Moss quickly complied with Holley's command and drove away.

Moss then located the children's parents, and together, they returned to the family's home, where the children remained inside and unattended. Moss and the parents safely entered their townhouse, but they could hear Holley screaming at them through the walls. Knowing that Holley was armed, the family lay on the floor of their home, and approximately fifteen minutes later, Moss heard what she believed to be a gunshot.

While Moss and her family were huddled inside their home, Wicker arrived at Holley's townhouse on her assigned USPS delivery route, as she had done for the past ten years. As Wicker approached Holley's mailbox, she noticed he was standing by the open second-floor window of his apartment. She greeted Holley

4                    Opinion of the Court                24-11843

and advised him that he had a package for delivery.[1]  Holley directed Wicker to open the package, but she told him that she could not do so because of government regulations.  He repeated his directive in an aggressive tone, yelling "do you think I'm fucking playing with you?"  When Wicker again refused to open the package, she looked up toward the window and saw that Holley was pointing a scoped assault rifle at her, with one hand in the trigger area.  Holley then ordered Wicker to move, first to the front of her postal vehicle and then to the rear.  Wicker followed Holley's commands until she was able to approach the driver's side door, at which point she entered the vehicle and drove away.

Wicker drove some forty feet, stopped the postal vehicle, and placed a 911 emergency call at 1:21 PM.  Wicker told the 911 dispatcher that a man had pointed a firearm at her while she was delivering his mail.  Approximately five minutes into the call, she reported that she "heard something hit the truck" and she thought "that he mighta shot at the truck."  Wicker remained on the line until 1:31 PM, shortly after the first police officers arrived on the scene.

While Wicker was on the line with the 911 operator, emergency dispatch received a second 911 call at 1:27 PM.  A male caller reported: "At my house this man has shot at the mail lady . . . . [he] said he gone kill everybody and he's walking around with a semiautomatic rifle."  The caller did not audibly provide his name, full

---

[1] The package was addressed to "Whitey White," which Wicker knew to be Holley's nickname.

address, or the name of the shooter before disconnecting the call at 1:28 PM.

Prompted by the 911 calls, multiple law enforcement officers were dispatched to the scene. One of them, Officer Manuel Neyra of the Florida City Police Department, directed frightened neighbors to a safe zone and established a perimeter around the townhouse. In the course of doing so, Neyra spoke to three unidentified bystanders. The first bystander explained that the individual who lived in the townhouse in question went by the name "White Boy." A second bystander identified the townhouse "where the lady got injured" and explained that the person who lived there "was out the window with a stick." Finally, a third bystander, speaking in Spanish, described the resident of the townhouse as a tall, light-skinned "mulatto" man, with light eyes. Each of these interactions was recorded on Neyra's body-worn camera.

Meanwhile, Sergeant Safiuddin Mohammed of the Miami-Dade Police Department, a member of its Priority Response Team, also arrived at the scene. An unidentified bystander drove up to Mohammed and claimed to be Holley's brother. The man provided Holley's full name, age, and a physical description, and advised Mohammed that there was an assault rifle inside Holley's residence. This interaction was likewise recorded on body-worn camera.

After establishing a perimeter and evacuating the nearby homes, the law enforcement officers positioned themselves at var-

ious points around the house to monitor Holley -- who was barricaded inside the residence -- and to secure the safety of the community. After some two hours of observation, a Special Response Team, which included additional law enforcement officers and snipers, arrived and drove an armored vehicle to the front of Holley's address. Holley then stuck his hands out the second-floor window in an apparent act of surrender, calmly exited his home, and was arrested by the police.

Following Holley's arrest, the local officers and FBI agents conducted multiple searches of the townhouse and the surrounding area. A sweep by the police established that no one else was inside Holley's home. During the sweep, the team observed an assault rifle on a bed in one of the second-floor bedrooms, and a stool next to an open window. Inside the townhouse, officers recovered an empty ammunition box, a live 9 millimeter round, two loaded gun magazines, and a loaded, scoped Hi-Point Rifle. The search team also found a single cartridge casing inside the townhouse, a jersey with the name "White Boy," and mail and identification cards in Holley's name. Finally, officers photographed a mangled microwave on Holley's driveway and extensive damage to an interior wall of the home.

Law enforcement officers also conducted a search of the area surrounding the townhouse and recovered three bullets and three shell casings, and documented a single bullet hole in the rear bumper of Wicker's postal vehicle. FBI agents recovered a bullet fragment from the postal vehicle's bumper too.

A law enforcement expert later examined Holley's assault rifle and the cartridge casing found on the second floor of the defendant's home. She concluded that Holley's Hi-Point assault rifle had discharged the casing.

*B.*

A federal grand jury sitting in the Southern District of Florida charged Holley in five counts: attempted murder of a federal employee, in violation of 18 U.S.C. §§ 1114(3) and 1113 (Count 1); assaulting a federal employee, in violation of 18 U.S.C. § 111(a)(1) and (b) (Count 2); brandishing and discharging a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and (iii) (Count 3); and, possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Counts 4 & 5).

Holley's counsel moved the court for a psychiatric examination to determine his competency to stand trial. The government did not oppose the application and, thereafter, the court sent the defendant for an examination at a federal facility. During the subsequent court-ordered examination, Holley told the evaluating forensic psychologist that approximately four days before the shooting, he began experiencing physical pain from "electrical currents" and "microwaves," which Holley thought were part of a law enforcement scheme to control him. Holley unplugged the appliances in his townhouse and built a barricade to lessen the "electric

current running through [him.]" Holley also explained that government agents had "messed with" his mail to provoke and sabotage him.

The evaluating psychologist concluded Holley's behavior and symptoms were "potentially consistent with psychosis." Based on this evaluation, a magistrate judge determined that Holley suffered from a mental disease that rendered him mentally incompetent to stand trial. The judge ordered that Holley be hospitalized for treatment.

Over the next two years, Holley underwent a second and third competency evaluation. The second one concluded that Holley was still incompetent and that he was unable to stand trial. The district court ordered Holley to continue with treatment in the federal psychiatric facility. The third competency evaluation, however, determined that while Holley "may presently suffer from a mental disease, his reported symptoms do not appear to impact his ability to understand the nature and consequences of the legal proceeding[s] or to assist properly in his defense."

After a competency hearing, the magistrate judge found, by a preponderance of the evidence, that Holley had become competent to stand trial.

### C.

Before the trial began, Holley objected to the introduction of numerous pieces of evidence, including several clips of body-

worn camera footage containing civil statements to law enforcement officials and statements made by a civilian claiming to be Holley's brother, and a recording of the unidentified man's 911 call. Holley argued that the exhibits contained inadmissible hearsay, violated the Confrontation Clause of the Sixth Amendment, and were unfairly prejudicial.

The district court overruled Holley's objections. The court found that the body-worn camera footage was not admitted for the truth of the matters asserted, but rather, was offered to explain the conduct of the law enforcement officials in investigating an emergency, ongoing shooting in a residential neighborhood. The court also found the bystanders' statements were nontestimonial in nature because they were animated primarily to assist in resolving an ongoing and dangerous emergency and, therefore, their admission did not violate the Sixth Amendment Confrontation Clause. Moreover, considering the short length of the footage (only a few minutes in all) and when coupled with a limiting instruction it gave to the jury, the trial court determined that the video exhibits were not unfairly prejudicial in violation of Federal Rule of Evidence 403. Further, the trial court determined that the unidentified man's statement in the 911 call was not hearsay; it was admissible as an excited utterance and a present sense impression under Federal Rule of Evidence 803(1) and (2). The court likewise determined that the recording of the 911 call was nontestimonial in nature and therefore not violative of the Confrontation Clause. Finally, the court found that the recording of the call was not unfairly prejudicial.

At trial, Wicker and Moss testified and recounted in some detail their experiences with Holley on the day of the shooting. Each of them explained that Holley had pointed a scoped assault rifle at them and that they had heard a gunshot. Further, the government called several responding law enforcement officers who testified that when they arrived on the scene, they encountered an ongoing, violent emergency involving an armed and at-large shooter. Finally, the jury heard testimony from a government ballistics expert who confirmed that Holley's Hi-Point Rifle had been discharged.

After a four-day trial, the jury acquitted Holley of attempted murder of a federal employee but convicted him on all other counts.

*D.*

As for the sentencing process, a probation officer determined that Holley's total offense level was 23 and that he had a criminal history category of IV, resulting in an advisory guideline range of 190 to 207 months' imprisonment comprised of concurrent sentences of 70 to 87 months' imprisonment on each of Counts 2 (assaulting a federal employee), 4 and 5 (possessing a firearm and ammunition as a convicted felon), to run consecutive to the mandatory minimum term of 120 months' imprisonment for Count 3 (brandishing and discharging a firearm in furtherance of a crime of violence).

The probation officer's final presentence investigation report also documented Holley's serious criminal record, spanning

24-11843                Opinion of the Court                11

well-over two decades, and which included, among others, convictions for burglary (1999); grand theft in the third degree (1999); resisting an officer and selling a controlled substance (2002); driving while under the influence (2008); criminal mischief (2010); and being a felon in possession of a firearm (2017).  The report also documented Holley's extensive mental health history and that the court had twice found him incompetent to stand trial.

Holley moved the court for a downward variance, arguing that "a sentence of 161 months' imprisonment (120 months for Count 3, consecutive to 41 months for Counts 2, 4, and 5)" would satisfy the sentencing factors embodied in 18 U.S.C. § 3553(a).[2]  He acknowledged that his crimes were serious, but urged that his "limited mental capacity and severe delusional state on the date of the offenses" mitigated his culpability.

For its part, the government sought a sentence at the high end of the guideline range.  It argued that Holley's psychological evaluations established that his actions likely were fueled by drugs

_____

[2] The sentencing factors enumerated in 18 U.S.C. § 3553(a) are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and, (10) the need to provide restitution to victims.

rather than a mental health episode, and that Holley's criminal history suggested that he had not accepted responsibility for his actions.

The district court declined to entertain a downward variance pursuant to § 3553(a), but determined that a sentence at the high end of the guideline range was "unnecessary." The court expressly rejected the government's assertion that Holley's behavior was drug-induced and instead found that on June 21, 2021, Holley was "clearly [in] a moment of crisis." The district court recognized that Holley had twice been found incompetent to stand trial and expressly observed that the defendant was "in some sort of a very challenging mental state at the time."

The district court imposed a sentence at the low end of the guideline range: a 192-month term of imprisonment (comprised of 72 months' imprisonment for Counts 2, 4, and 5, each to run concurrently with the other, all to run consecutive to the 120-month mandatory minimum sentence for Count 3). It also imposed a three-year term of supervised release and four $100 special assessments.

This timely appeal of Holley's convictions and sentence ensued.

## II.

### A.

We begin with Holley's claim that the district court erred when it failed to exclude the five exhibits at trial, which, he says,

violated both the Federal Rules of Evidence and the Confrontation Clause. Again, the challenged exhibits are four clips of body-worn camera footage documenting bystander statements to police officers ("Exhibits 15-C, 15-D, 15-E, and 50-A"), and a recording of the unidentified man's 911 call to a police dispatcher ("Exhibit 14").

We review a district court's evidentiary rulings only for an abuse of discretion. *United States v. Jeri*, 869 F.3d 1247, 1259 (11th Cir. 2017) (citing *United States v. Wilk*, 572 F.3d 1229, 1234 (11th Cir. 2009)). But whether a hearsay statement is testimonial in nature for purposes of the Confrontation Clause is reviewed de novo. *United States v. Cooper*, 926 F.3d 718, 730 (11th Cir. 2019) (citing *United States v. Caraballo*, 595 F.3d 1214, 1226 (11th Cir. 2010)). However, even if the district court's ruling violated the Federal Rules of Evidence or the Confrontation Clause, we would not reverse if the error was harmless. *United States v. Augustin*, 661 F.3d 1105, 1123 (11th Cir. 2011) (per curiam) (harmless error standard applies to erroneous evidentiary rulings); *Chapman v. California*, 386 U.S. 18, 24 (1967) (harmless error standard also applies to violations of the Confrontation Clause).

Holley's argument breaks down into whether the exhibits violated the Federal Rules of Evidence because they contained impermissible hearsay and were unfairly prejudicial, and whether they violated the Confrontation Clause because they were testimonial in nature. Neither claim is persuasive.

*B.*

The district court did not err when it admitted the body-worn camera footage in Exhibits 15-C, 15-D, 15-E, and 50-A.  The bystanders' recorded statements were not inadmissible as hearsay, they were not unfairly prejudicial, and they did not implicate the Confrontation Clause.

The Federal Rules of Evidence define hearsay as an out-of-court statement offered "to prove the truth of the matter asserted." FED. R. EVID. 801(c).  But "[a]n out-of-court statement offered to show its effect on the listener isn't hearsay because it's not offered 'to prove the truth of the matter asserted.'"  *United States v. Starr*, 159 F.4th 901, 909 (11th Cir. 2025) (quoting FED. R. EVID. 801(c)). Non-hearsay statements are, therefore, admissible without needing to fit within an exception, *United States v. Mateos*, 623 F.3d 1350, 1364 (11th Cir. 2010), and do not implicate the protections of the Confrontation Clause, *see Smith v. Arizona*, 602 U.S. 779, 785 (2024) (explaining "the Clause bars only the introduction of hearsay -- meaning, out-of-court statements offered 'to prove the truth of the matter asserted'" (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974))).

For starters, the district court did not abuse its considerable discretion in finding that the bystanders' statements contained in Exhibits 15-C, 15-D, 15-E, and 50-A were admissible because they were not admitted for the truth of the matters asserted, but rather, they were offered to explain the conduct and behavior of the police

officials in facing an ongoing shooting emergency. At trial, the government presented no argument that the bystanders' statements were true or false. The government offered those statements solely to explain the nature and course of the law enforcement officers' investigation, including their decisions to establish a perimeter, evacuate neighbors from the surrounding area, and focus their response on Holley's home.

The caselaw of this Circuit allows for the admission of out-of-court statements offered not for the truth of the matters asserted, but rather to "help explain the course of a complex investigation," so long as "the danger of unfair prejudice caused by the use of the statements does not substantially outweigh the probative value of the evidence." *United States v. Pendergrass*, 995 F.3d 858, 878 (11th Cir. 2021) (first citing *United States v. Jiminez*, 564 F.3d 1280, 1288 (11th Cir. 2009); then citing *United States v. Elysee*, 993 F.3d 1309, 1339 (11th Cir. 2021)). That is, when out-of-court statements explain the conduct of police on the scene, we have allowed their admission so long as they do not violate Rule 403's balancing test. *See* FED. R. EVID. 403 (explaining a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice"). Moreover, "Rule 403 is an extraordinary remedy, which should be used only sparingly," and the balance "should be struck in favor of admissibility." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (citation modified) (quoting *United States v. Norton*, 867 F.2d 1354, 1361 (11th Cir. 1989)); *see also United States v. McGregor*, 960 F.3d 1319, 1324 (11th Cir. 2020).

In this case, the admitted video clips were short, each containing less than two minutes of footage, and three of the exhibits (Exhibits 15-C, 15-D, and 15-E) do not implicate Holley by name at all. Although the unidentified bystander in Exhibit 50-A identified Holley by his full name, the government never argued that this statement was direct proof of Holley's guilt or otherwise urged the jury to consider the matter for the truth asserted. The district court thereby acted within its ample discretion when it found that the probative value of these exhibits was not substantially outweighed by the danger of unfair prejudice.

The district court's thorough admonition that the jury must not consider the video exhibits for the truth of the matters asserted further reduced the danger of unfair prejudice. The court's limiting instruction read this way:

> There are going to be a number of body-worn cameras that are going to be played for you guys in small clips. In those body-worn cameras, you are going to hear statements made by people on the ground, potential witnesses, people in the neighborhood, about what is happening. You should not, and I repeat, not consider any statements made by anyone in those videos as truth of what is being alleged in this case. Those statements are simply being considered by law enforcement to develop their investigation. So I want you guys to understand, you shouldn't think of anything you hear as being proven or shown. It's more for the state of mind of the officers, so they know

things like perimeter, setting up the investigation, things like that.

After giving this instruction, the court went even further, securing the jurors' verbal acknowledgment that they understood its directive. The record offers no basis to doubt the jury's compliance, and we have every reason to presume that the jury followed the court's instruction. *See United States v. Bell*, 112 F.4th 1318, 1341 (11th Cir. 2024) ("We must presume, in absence of contrary evidence, that the jury followed limiting instructions." (citing *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005) (per curiam)), *cert. denied*, 145 S. Ct. 2847 (2025) (mem.); *see also United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011).

Taken together, the court's careful evidentiary handling, the government's narrow use of the footage, and the controlling precedent in this Circuit foreclose any fair claim that the district court abused its discretion.

Holley resists this conclusion, arguing that the footage was admitted for its truth *because* the bystanders' statements directly implicated him. Holley also says that the district court's limiting instruction was insufficient to protect against the risk of unfair prejudice. In support, Holley primarily relies on non-binding, out-of-Circuit caselaw, which is inapplicable.

Holley cites to *United States v. Hamann*, 33 F.4th 759 (5th Cir. 2022), where a panel of the Fifth Circuit explained that out-of-court statements "specifically link[ing] a defendant to the crime" are inherently offered for their truth, regardless of the relevance of the

evidence in explaining a law enforcement officer's investigative choices. *Id.* at 770 (quoting *United States v. Jones*, 930 F.3d 366, 377 (5th Cir. 2019)); *see also United States v. Kizzee*, 877 F.3d 650, 659 (5th Cir. 2017). *Hamann* is neither binding nor analogous. Again, only one of the four video exhibits in this case directly implicated Holley (Exhibit 50-A). And while the bystander in Exhibit 50-A identified Holley by name, our caselaw does not categorically bar its admission. *See, e.g.*, *Pendergrass*, 995 F.3d at 878 (first citing *Jiminez*, 564 F.3d at 1288; then citing *Elysee*, 993 F.3d at 1338–39); *see also United States v. Kent*, 93 F.4th 1213, 1220 (11th Cir. 2024) (explaining that "inculpatory evidence . . . may be admissible if it is relevant for a non-hearsay purpose").

Moreover, Holley's argument that the court's limiting instruction was insufficient to mitigate the prejudicial nature of the bystanders' statements is unpersuasive. Holley does not challenge the substance of the district court's instruction; instead, he says that no limiting instruction could *ever* be sufficient to cure the unfair prejudice inherent in the bystanders' statements. Holley again relies on out-of-circuit precedent. *See United States v. Lasley*, 917 F.3d 661, 665 (8th Cir. 2019) (per curiam); *United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013), *reh'g denied* (Jan. 16, 2014). This Court, however, has never gone that far.

Holley's reliance on *Lasley* is misplaced and perplexing. In *Lasley*, a panel of the Eighth Circuit presumed that the jury followed the district court's limiting instruction and declined to

"adopt the rule from one of our sister circuits that a limiting instruction is unlikely to protect against highly prejudicial information when that information went to the heart of the prosecution's case." *Lasley*, 917 F.3d at 665–66 (first citing *United States v. Levine*, 477 F.3d 596, 604–05 (8th Cir. 2007); then citing *Nelson*, 725 F.3d at 622).

*Nelson* similarly lends no support. There, a panel of the Sixth Circuit explained that "[a] limiting instruction is not always sufficient to cure the harm of highly prejudicial information improperly admitted at trial." 725 F.3d at 622 (first citing *United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990); then citing *Bruton v. United States*, 391 U.S. 123, 132 (1968)). But the panel did not construct a broadly applicable rule and instead determined only that the district court's curative instructions "were not sufficient to eliminate the prejudice *on the facts of this case*." *Id.* (emphasis added).

Finally, because the video evidence was admitted for a valid non-hearsay purpose, Holley's Confrontation Clause challenges to Exhibits 15-C, 15-D, 15-E, and 50-A necessarily fail too.

Although Holley's initial brief devotes extensive discussion to the claimed Confrontation Clause violations regarding Exhibits 15-C, 15-D, and 15-E, he presents only a single, passing suggestion that the admission of Exhibit 50-A likewise violated the Confrontation Clause. The law in this Circuit requires an argument to be raised *and developed* in an initial brief, otherwise it is considered abandoned. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a

claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." (citation modified)).  This is reason alone to reject Holley's Sixth Amendment challenge to Exhibit 50-A.  But we also do so on the merits, as the admission of the four video exhibits did not violate the Constitution.

The Sixth Amendment's Confrontation Clause provides a "bedrock procedural guarantee" that the accused shall have the right to confront the witnesses against him.  *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (citing *Pointer v. Texas*, 380 U.S. 400, 406 (1965)); *see* U.S. CONST. amend. VI.  Notably, however, the Confrontation Clause "bars only the introduction of hearsay."  *Smith*, 602 U.S. at 785.  If a statement is not admitted for the truth of the matter asserted, the Confrontation Clause simply is not implicated "because the need to test an absent witness ebbs when her truthfulness is not at issue."  *Id.* (first citing *Anderson v. United States*, 417 U.S. 211, 220 (1974)); then citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).  Thus, because Exhibits 15-C, 15-D, 15-E, and 50-A were not admitted for their truth, they necessarily do not implicate the protections of the Confrontation Clause.

But even if the video exhibits were admitted for the truth of the matters asserted, Holley's Confrontation Clause challenges would still fail because the bystanders' statements were plainly nontestimonial in nature.  The Supreme Court has explained that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that

the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006); *see also Michigan v. Bryant*, 562 U.S. 344, 366 (2011) (finding that statements made to police "in an exposed, public area . . . and in a disorganized fashion" were nontestimonial in nature).

Here, the record shows that the bystanders' statements to Officer Neyra and Sergeant Mohammed were made to assist police in addressing the sort of ongoing emergency the Supreme Court envisioned in *Davis* and in its progeny. The responding law enforcement officers faced a situation that was undeniably fluid, violent, and still unfolding: an armed suspect peering out of a home's bedroom window in a residential neighborhood threatened at least two people, including a mail carrier; shot at and hit a postal vehicle which had been driven by the mail carrier; the shooter remained barricaded inside his apartment; and his identity was unknown. Just as in *Michigan v. Bryant*, 562 U.S. 344 (2011), the brief, informal exchanges the police had with the bystanders were undeniably aimed at resolving the unfolding crisis rather than creating a record for later prosecution. *Id.* at 366.

## C.

We are similarly unpersuaded by Holley's challenge to the admission of Exhibit 14, which contained the unidentified man's 911 call. Holley's argument follows the same form as his other evidentiary challenges: he claims that the contents of the call

amounted to inadmissible hearsay; they were unfairly prejudicial; and they were admitted in violation of the Confrontation Clause.

Unlike the video exhibits, Exhibit 14 was admitted, at least in part, for the truth of the matter asserted by the caller. The government itself explained that the exhibit served the dual purpose of "show[ing] the effect on law enforcement's response" and "corroborat[ing] Wicker's account of the event." Although the caller's statement was not admitted for its truth to the extent it was admitted to show its effect on law enforcement personnel, it *was* admitted for its truth to the extent it was admitted to bolster letter carrier Wicker's testimony, to wit, that someone had "shot at the mail lady." Exhibit 14, therefore, would be inadmissible hearsay unless it fell within one of the hearsay rule's exceptions. FED. R. EVID. 802; *Caraballo*, 595 F.3d at 1226.

The parties sharply disagree as to whether any hearsay exception applies. The government asserts that the district court acted within its discretion when it found that the caller's statements were a present sense impression and an excited utterance. Holley says otherwise. He argues that the record supplies no indicia of reliability to permit admission of the call under either exception, and that the government's inability to identify the caller was fatal to the call's admission.

We remain unpersuaded and conclude again that the district court acted within its considerable discretion when it determined that the caller's statement was admissible under the exception for present sense impressions.

24-11843                Opinion of the Court                23

Present sense impressions are "statement[s] describing or explaining an event or condition, made while or immediately after the declarant perceived it." FED. R. EVID. 803(1). "The underlying theory of this exception is that the 'substantial contemporaneity of the event and the statement negate the likelihood of deliberate or conscious misrepresentation.'" *United States v. Scrima*, 819 F.2d 996, 1000 (11th Cir. 1987) (quoting *United States v. Peacock*, 654 F.2d 339, 350 (5th Cir. Aug. 1981), *vacated in part on reh'g*, 686 F.2d 356 (5th Cir. Unit B 1982) (per curiam)).[3] A party seeking to introduce an out-of-court statement as a present sense impression must establish "a proper foundation" for its admission. *United States v. Keegan*, 161 F.4th 1334, 1341 (11th Cir. 2025) (citation modified).

The record supplies sufficient indicia of reliability and establishes a sufficient foundation to support the admission of Exhibit 14 as a present sense impression. The contested 911 call (initiated at 1:27 PM and ending at 1:28 PM) was entirely contemporaneous with the unfolding emergency and with Wicker's 911 call (initiated at 1:21 PM and ending at 1:31 PM). Wicker had recounted in real time that she thought a bullet had hit her postal vehicle. Moreover, the 911 caller used gerunds to describe his observations, stating: "[H]e gone kill everybody and he's walking around with a semi-automatic rifle." The caller's own sentence structure strongly suggests that he was describing immediately occurring conduct.

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981. *Id.* at 1209.

Contrary to Holley's claim, our Circuit has not imposed a categorical rule requiring the identification of the caller where there are other compelling indicia of reliability and the contemporaneity of the statement.  Holley cites no caselaw to support his assertion and we find it unpersuasive.  Thus, when we consider the timing, and the nature and substance of the 911 caller's statement, we are satisfied that the district court acted within its discretion in concluding that Exhibit 14 was admissible as a present sense impression.

Separately, Holley argues that the district court's admission of this exhibit violated Federal Rule of Evidence 403.  Again, under this rule, even when an out-of-court statement is otherwise admissible, a district court still "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  FED. R. EVID. 403.  Our caselaw affords a district court considerable discretion in weighing the probative value against the risk of unfair prejudice, and we review these determinations only for an abuse of discretion.  *See United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010).

The admission of Exhibit 14 served legitimate probative purposes.  Beyond offering a clear explanation for the conduct of the police and the course of the investigation, the exhibit corroborated and bolstered Wicker's testimony by offering additional support for the chronology of the events.  Moreover, the caller did not identify Holley by name or provide any description of the shooter,

thereby minimizing the risk that the exhibit would unfairly preju-
dice him.  Even if the caller's statement that the shooter "said he
gone kill everybody" carried some risk, it was not an abuse of dis-
cretion for the district court to find that the risk did not substan-
tially outweigh the exhibit's probative value.  *See United States v.
McRae*, 593 F.2d 700, 707 (5th Cir. 1979) (explaining that "[r]elevant
evidence is inherently prejudicial; but it is only unfair prejudice,
substantially outweighing probative value, which permits exclu-
sion of relevant matter under Rule 403" (citation modified)).

Finally, Holley's cursory argument that the district court ad-
mitted Exhibit 14 in violation of the Confrontation Clause is with-
out merit.  First, Holley's Confrontation Clause challenge to Ex-
hibit 14 was similarly abandoned on appeal because he raised the
argument for the first time in reply.  *Lovett v. Ray*, 327 F.3d 1181,
1183 (11th Cir. 2003) (per curiam) ("Because he raises that argu-
ment for the first time in his reply brief, it is not properly before
us." (citing *Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir. 1994))).
But he loses on the merits as well.

Because the caller's statement was admitted at least in part
for the truth of the matter asserted, we review de novo whether
the statement was also testimonial for purposes of the Confronta-
tion Clause.  *United States v. Lamons*, 532 F.3d 1251, 1261 n.15 (11th
Cir. 2008) (citing *United States v. Underwood*, 446 F.3d 1340, 1345
(11th Cir. 2006)).  The central question, then, "is whether, objec-
tively considered, the interrogation that took place in the course of

the 911 call produced testimonial statements." *Davis*, 547 U.S. at 822.

It is broadly recognized that 911 calls are "ordinarily not designed primarily to 'establish or prove' some past fact, but to describe current circumstances requiring police assistance." *Id*. at 827 (citation modified) (quoting *Crawford*, 541 U.S. at 51). A 911 call can be transformed into an interrogation that aims to establish events relevant to a criminal prosecution, but there was no such transformation here. This record establishes that the caller contacted a police emergency dispatcher to seek assistance in response to a violent, volatile situation involving an active shooter. Nothing in the record suggests that the caller was attempting to memorialize past events or that the 911 operator steered the exchange with the aim of building a case for later prosecution. At no point was the caller asked to provide a narrative account of the events or the identity of a suspect. Instead, the operator's questions reflected the practical exigencies of an emergency response. The dispatcher only sought to ascertain the nature of the threat and the location of the incident, and to promptly pass that information on to a responding law enforcement officer.

Under these objective circumstances, we have little difficulty in concluding that the primary purpose of the call was to secure assistance in an ongoing and potentially violent emergency, not to create a substitute for in-court testimony. The caller's statement was therefore nontestimonial in nature, and its admission did not violate Holley's rights under the Confrontation Clause.

Finding the district court did not err in admitting any of the challenged exhibits, we see no occasion to proceed to a harmless error analysis. *See Chapman*, 386 U.S. at 24; *Augustin*, 661 F.3d at 1123.

**III.**

Finally, we address Holley's challenge to his sentence. His argument is limited to the claim that the district court abused its discretion "by failing to adequately weigh the impact that [his] mental health crisis had on the offense's commission." Holley's argument both misapprehends the law and mischaracterizes the district court's fulsome consideration of the applicable sentencing factors, including the defendant's mental health.

We review a district court's sentence for reasonableness, applying the deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 46 (2007); *see also United States v. Grushko*, 50 F.4th 1, 10 (11th Cir. 2022). A sentence is substantively unreasonable if it "(1) fails to afford consideration to relevant factors [listed in § 3553(a)] that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (citation modified). However, a district court "may give greater weight to some factors over others or even attach great weight to a single factor -- a decision that is within its sound discretion." *Grushko*, 50 F.4th at 19 (first citing *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254

(11th Cir. 2015); then citing *United States v. Kuhlman*, 711 F.3d 1321, 1327 (11th Cir. 2013)).

We will only vacate a sentence if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (citation modified). The relevant inquiry is "whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in section 3553(a)." *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam). It is the moving party's burden to "establish[] that the sentence is unreasonable in the light of both that record and the factors in section 3553(a)." *Id.*

The long and short of it is that the district court carefully considered each sentencing factor and imposed a substantively reasonable sentence. The record reveals that the court extensively considered Holley's mental health challenges as required by § 3553(a)(1), and beyond considering this factor, the court assigned it substantial weight. At the sentencing hearing the district court extensively discussed Holley's mental health on two separate occasions. It first explained:

> I understand that the bulk of that argument has really focused on the background of Mr. Holley, and not only the circumstances of the offense, but some well-documented concerns with mental health which have really been pervasive in this case from the beginning. We know that this case was stalled for a bit of time

while competency was established, or regained, before we could go forward at trial. So I'm very much aware of that concern.

Later in the sentencing hearing the court again addressed Holley's mental health history this way:

> On the day of this incident, it's pretty clear to me that surrounding that time period in Mr. Holley's life, he was in some sort of mental crisis. . . . So although it's not certainly an excuse, it doesn't mean that the mental health concerns warrant a variance. I think that they certainly countenance against the need to go to the top of the guidelines because we need to make sure we reflect the circumstances of the offense itself. And again, a serious offense, without a doubt, one that deserves a just punishment. But also, I don't want to make light of the fact that he really was in some sort of a very challenging mental state at the time. I don't think that can really be rebutted based on the evidence in this case. So I do reflect that in developing a sentence in this case that stays within the guideline range, but will trend towards . . . the bottom of the guideline range as opposed to the high end ra[n]ge.

The record, therefore, shows that the district court adequately considered Holley's mental health and how it may have affected the commission of the crime. The district court acted in a manner fully consonant with its obligations under § 3553(a).

Holley, nevertheless, says that the district court abused its discretion because it "fail[ed] to give sufficient weight" to Holley's mental illness and his need for treatment services.  But the law requires only that the district court *consider* the relevant § 3553(a) factors, not that it assign any factor the particular weight that a defendant prefers.  The district court did just that, and we can discern no error.

**AFFIRMED.**